ORIGINAL

James H. Fosbinder #7070
IVEY FOSBINDER FOSBINDER LLLC
A LIMITED LIABILITY LAW COMPANY
1883 Mill Street
Wailuku, Hawaii  96793
Telephone:  (808)242-4956
Facsimile: (808)249-0668
Email: jfosbinder@iff-law.com

Attorneys for Plaintiff
RICHARD LEONARD RADFORD

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

DEC 23 2010

at ___ o'clock and ___ min ___ M.
SUE BEITIA, CLERK

## UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| RICHARD LEONARD RADFORD;<br><br>      Plaintiff,<br><br>    vs.<br><br>U.S. BANK NATIONAL ASSOCIATION,<br>as Trustee for the Structured<br>Asset Investment Loan Trust,<br>2006-BNC3; BNC MORTGAGE, INC.;<br>MORTGAGE ELECTRONIC<br>REGISTRATION SYSTEMS, INC.;<br>MERSCORP., INC. (MERS); and<br>JOHN DOES 1-50, inclusive;<br><br>      Defendants. | CIVIL NO.: CV10 00766ACK KSC<br><br>COMPLAINT; DEMAND FOR JURY<br>TRIAL; SUMMONS |

### COMPLAINT

Plaintiff RICHARD LEONARD RADFORD (Plaintiff), by and

through his attorney, JAMES H. FOSBINDER, of IVEY,

1

FOSBINDER, FOSBINDER LLLC, a limited liability law company,
brings the following Complaint and alleges as follows:

## JURISDICTION AND VENUE

1.    Jurisdiction arises under 28 U.S.C. § 1331
(Federal Question Jurisdiction); the Clayton Anti-Trust
Act, 15 U.S.C. § 12, et seq.; the Federal Truth in Lending
Act (hereinafter "TILA"), 15 U.S.C. § 1601, et seq., and
the Act's corresponding Regulation Z (24 C.F.R. Part
3600.1-3500.17) and Regulation X (24 C.F.R. Part 3500); the
Real Estate Settlement Procedures Act (hereinafter
"RESPA"), 12 U.S.C. 2601, et seq.; Home Ownership Equity
Protection Act (HOEPA), 15 U.S.C. 1639 et seq.; Title 24
CFR, Regulation X, Part 3500; the Equal Credit Opportunity
Act (Reg. B, 12 C.F.R. 202); Fair Credit Reporting Act, 15
U.S.C. 1681, et seq.; Fair Debt Collection Procedures Act
(FDCPA), 15 U.S.C. Sec. 1692-1692p; and 18 U.S.C. §§ 1341,
1343.

2.    Jurisdiction also arises under 28 U.S.C. § 1332
(Diversity Jurisdiction).

3.    This Court has supplemental jurisdiction over
this action under 28 U.S.C. § 1367(a) because state law
claims are so related to the federal claims that they form
part of the same case or controversy. These claims all
arise out of the same controversy and sequence of events.

This Court has jurisdiction over state claims asserted under Hawaii Revised Statutes (hereinafter "HRS") by virtue of pendent jurisdiction.

4.    Venue is proper in the United States District Court for the District of Hawaii, pursuant to 28 U.S.C. § 1391, in that Defendants systematically conduct and transact substantial business in this State and District as licensed banks and corporations organized and/or operating in the State of Hawaii, the causes of action occurred in this District, and Plaintiff resides in this District.

## PARTIES

5.    Plaintiff, RICHARD LEONARD RADFORD is and was at all times relevant over the age of eighteen, a resident of the County of Maui, State of Hawaii, and is a consumer in regards to credit transactions.

6.    Defendant U.S. BANK NATIONAL ASSOCIATION, as Trustee for the Structured Asset Investment Loan Trust, 2006-NBC3 is a National Banking Association holding mortgage loans secured by real estate property in the State of Hawaii.

7.    Defendant BNC MORTGAGE, INC., a Delaware Corporation, whose corporate headquarters are in Irvine, California, was at all times relevant hereto, a National Banking Association holding mortgage loans secured by real

estate property and conducting business within the State of Hawaii.

8.     Defendant BNC MORTGAGE, INC., as  business in the State of Hawaii, was the lender under Mortgage dated May 23, 2006, in the amount of $1,452,500, which was recorded in the State of Hawaii Bureau of Conveyances, on May 30, 2006, Document No. 3434277 (Mortgage).

9.     Defendant MERSCORP, Inc. is a Delaware corporation whose corporate headquarters is in Virginia. Shareholders and MERS membership include a majority of corporations engaged in the mortgage industry in the United States.[1]

10.    Defendant MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. (MERS), a New York corporation, is a wholly owned subsidiary of Defendant MERSCORP, Inc. MERS provides

---

[1] MERSCORP, INC.'s shareholders include ABN-AMRO Mortgage Group, Inc.; American Land Title Association; CCO Mortgage Corporation; Chase Home Mortgage Corporate of the Southeast; CitiMortgage, Inc.; Commercial Mortgage Securities Association; Corinthian Mortgage Corporation; Countrywide Home Loans, Inc.; EverHome Mortgage Company; Fannie Mae; First American Title Insurance Corporation; Freddie Mac; GE Mortgage Services, LLC; GMAC Residential Funding Corporation; Guaranty Bank; HSBC Finance Corporation; Merrill Lynch Credit Corporation; MGIC Investor Services Corporation; Mortgage Bankers Association; Nationwide Advantage Mortgage Company; PMI Mortgage Insurance Company; Stewart Title Guaranty Company; SunTrust Mortgage, Inc.; United Guaranty Corporation; Washington Mutual Bank; Wells Fargo Bank, N.A., and WMC Mortgage Corporation.

mortgage related services in all fifty states, and is

"nominee" for Defendant BNC MORTGAGE, INC., pursuant to the

Mortgage, dated May 23, 2006, and recorded in the State of

Hawaii Bureau of Conveyances, on May 30, 2006, Document No.

3434277.  Defendant MERS transferred any interest it held

as "nominee" to Defendant BNC MORTGAGE, INC., through an

Assignment of Mortgage, dated November 19,2008 and recorded

in the State of Hawaii Bureau of Conveyances on December 8,

2008, Document No. 3811387.

11.  The acts and/or omissions of Defendants, and each

of them, alleged in this Complaint were performed by their

agents, officers, affiliates and/or employees within the

scope of their actual or apparent authority which were

known and/or should have been known to Defendants and/or

their predecessors in interest and/or are imputed to

Defendants.

12.  DOES Defendants 1-50, inclusive, are various

individuals, partnerships, associations, corporations, and

other entities claiming any legal right, title, estate,

lien, or interest in the Subject Property, as described

adverse to Plaintiff's interests. Plaintiff will make a

good faith effort to determine the true names and

identities of these parties. Plaintiff reserve the right to

amend this Complaint to add such parties as their true identities and capacities are ascertained through discovery or otherwise.

13.   Additionally, Defendants operate mortgage originating and mortgage servicing businesses that solicit, cater, and service millions of home loans annually.  Based on understanding and belief, Defendants and their agents, officers, affiliates and/or employees have operated as a common enterprise while engaging in the unlawful acts and practices alleged below. Because Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below.

## INTRODUCTION[2]

14.   Historically, mortgage loans have made by lenders within the local marketplace. Banks made money by charging more interest than they paid to depositors. If the bank made bad loans, the bank lost income. For this reason,

---

[2] This is an extraordinary case. At times, as explained in this Complaint, terms to do not have their traditional meanings as they have been converted by MERS. For this reason, it is believed that an unconventional pleading style can and will best convey the Plaintiff's message, and tolerance for such unconventionality is respectfully requested as being in the best interests of justice and truth. In light of the liberties taken by the Defendants in terms of judicial and statutory administration and procedure, the tolerance of this Court for the slightly unconventional stylings of the undersigned counsel in this pleading would seem warranted.

banks made serious investigation of the borrower's ability
to pay back the loan. When a bank approved a loan
application, it meant something; it meant it was likely the
borrower *could* and would repay the loan. Loans often
remained with the original lender for the lifetime of the
loan.

15.   Although speculation in real estate existed,
profits were generally made from appreciation of land
values over time largely because of the checks and balances
of the loan origination process itself and also due to the
demands of the statutory recordation requirements. The only
way to aggressively buy and sell an interest in mortgage-
related assets on a frequent basis was to buy stock in
corporations that were set up to invest in real estate.
Most important, it was almost impossible to invest, in a
speculative way, in single-family homes. You could invest
in the stocks of companies that built single-family homes,
or in the stock of lenders that financed home loans, but
that was about it. Day trading in securities based on real
property did not exist, and the securitization of
residential mortgages was non-existent.

16.   Transactions in real property such as deeds,
mortgages, and assignments of mortgage were recorded in the
Hawaii Bureau of Conveyances and/or with the Assistant

Registrar of the Land Court. If a mortgage was assigned to a new mortgagee, that assignment was recorded and therefore was publicly available for review.

17. These recordings were not fast or cheap enough for the mortgage industry. Seeking a means of capitalizing on the huge profits to be made from mortgage securitization, the largest banks in the United States got together to form Merscorp, Inc., in or about 1996. Mortgage Electronic Registration System, Inc., whose sole shareholder is Merscorp (Collectively, the entities are referred to herein as "MERS"), was then allegedly created to streamline the mortgage banking industry by using "electronic commerce" to eliminate paper – which allowed the mortgage industry to circumvent the state's recordation statutes and bundle mortgages into packages they could then sell to investors.

18. MERS' mission was to register every mortgage loan in the United States[3] to facilitate trading in mortgage-backed securities. The MERS monopoly now includes more than 90 percent of the mortgage lenders and servicers active in the United States real estate market. Since its creation, MERS has undermined and eviscerated the long-standing

---

[3] "About MERS," Merscorp, Inc.
www.mersinc.org/about/index.aspx. Retrieved 11/8/2010.

principles of real property law and the state's recording
statutes. Hence, the borrowers and the public at large are
paying an enormous price for the profits reaped by this
scheme, not to mention robbing the states of their transfer
and excise tax revenues.

19. The way that MERS circumvents the state's
recording statutes is as follows: In mortgages, MERS is
named as "nominee" for the lender (arguably a form of
agency). It is often the entity recorded in the state
recordation office as being the original mortgagee. MERS
claims that this "inoculates" the mortgage against future
assignments because MERS remains the nominal mortgagee "no
matter how many times servicing is traded."[4] Tracking
subsequent assignments of mortgage happens strictly within
the MERS databases.

> "Because MERS remains the mortgagee of record in
> the public land records throughout the life of
> the loan; it eliminates the need to record later
> assignments in the public land records… . MERS
> does not create electronic assignments; it
> eliminates the need for subsequent assignments
> altogether. After MERS becomes Mortgagee, there
> are no more assignments, except on the rare
> occasion when a Member wants an assignment from
> MERS."[5]

---

[4] Id., "About MERS," Merscorp, Inc.
www.mersinc.org/about/index.aspx. Retrieved 11/8/2010.
[5] *R.K. Arnold, "Yes, There is Life on MERS® " Real Estate
Law, ABA Network, Spring 1998, Vol. 2, No. 1.*
http://www.abanet.org/genpractice/magazine/1998/spring-
bos/arnold.html.

20.   A typical clause naming MERS in a mortgage is as
follows: *"MERS" is Mortgage Electronic Registration
Systems, Inc. MERS is a separate corporation that is acting
solely as nominee for Lender and Lender's successors and
assigns. MERS is the mortgagee under this Security
Instrument.*

21.   Recent legal challenges have questioned the legal
inconsistencies in MERS' roles: as "nominee" (arguably
"agent") and also as "mortgagee," i.e., the owner of the
real property right to foreclose. An entity can not be both
an agent and a principal with respect to the same right.
Further, upon information and belief, the State of Hawaii
has never authorized MERS to make changes to the state's
real property recording statutes. Plaintiff argues that
MERS, purporting to act "solely as nominee," furthers
foreclosures by (among other acts) transferring promissory
notes and appointing assignees under assignments of
mortgage in a system that is hidden from public and
governmental scrutiny and oversight. For example, it is
nearly impossible for any but the savviest researcher to
discover the trail of assignments leading to a borrower's
current note holder and mortgagee. In many cases, the
actual mortgage and promissory note have been destroyed or

are now missing, which raises questions of who owns the
mortgage and note and how, or who, enforces these
agreements. Missing documents leaves the parties to the
contract unidentifiable, which also affects contract
reformation and those wishing to effectuate a loan
modification.

22.   Hand-in-hand with the largest lending
institution's joint creation of MERS, the mortgage industry
introduced new products such as no-documentation loans,
adjustable-rate mortgages, known as "ARMS," and, negative
amortization adjustable rate mortgages; where a borrower
could owe more on the principal each, and every month.
Mortgage lenders acting in concert relaxed lending
standards, making low-income individuals eligible for
loans. This in turn, drove up property values. Part of this
scheme included accepting appraisals that purported to
document the new, higher values. The result was that
hundreds of thousands of applications for financing were
approved nationwide, most of which would have been declined
under traditional lending standards.

23.   Behind the veil of Merscorp and MERS, the big
lending institutions knew they were issuing bad paper, but
they intended to get in and get out of the mortgage backed
securities marketplace before the borrowers defaulted on a

loan they could never afford - and should never have been
coerced into in the first place. The result is that the
borrowers and the investors in mortgage-backed securities
were both victims of this mass fraud perpetuated by MERS
and its members. Both the borrower and investor were sold a
bill of goods that was over-inflated in value and quality.

24.   MERS was created primarily to facilitate the
securitization of mortgages, which, in simple terms,
involves three steps: First, a mortgage is sold by its
originating lender; second, the mortgages are "bundled" or
"pooled"; third, the pool of mortgages is securitized and
divided into "tranches" (broken up into groups indicative
of the risk) and sold to investors.

25.   The third step - securitization - of a pool of
mortgages is complicated, and the process is (or should be)
governed by the laws of the jurisdiction in which the
securitization takes place. The early mortgage
securitization contracts were designed to satisfy state and
federal laws, such as the Uniform Commercial Code
(governing "secured" transactions), and state trust law
(packaged loans were often put into trusts to allegedly
offered protections that appealed to investors).

26.   Securitizing a mortgage loan is labor-intensive:
The promissory note had to be endorsed by the originator

and other parties before it could be placed into the trust, and the mortgage had to be assigned to the note-holder. Generally, this process must be completed within 90 days of a trust's "closing." Most mortgage-backed securities are similar to bonds, most being issued by U.S. government-sponsored Federal National Mortgage Association (Defendant FNMA) and the Federal Home Loan Mortgage Corporation (Freddie Mac).

27.   With the securitization of mortgages, investors could wager on the failure of mortgages. When interest rates rose, these mortgage-backed securities (similar to bonds) fell in value; conversely, when interest rates fell, the value of the mortgage backed security rose.

28.   MERS, its members, and others with inside information could win big.  If an investor was privy to information that a good number of mortgages in a pool would fail, or that the mortgages exceeded the value of the collateral; they could bet these mortgage-backed securities would be worth less in the future. Add to this the leverage available through the options, or futures markets, and an institution could gamble on millions of dollars of mortgages with very little investment. These highly leveraged "derivatives" enabled investors to capitalize on

mortgages being worth more, or worth less, in the short term without holding the underlying note or mortgage.

29.   Hence, a banking institution could "insure" itself against losses in the underlying mortgages by betting that a number of the mortgages it underwrote, would fail.  Talk about inside information.  Making the deal even sweeter for the banks, and originators of the loans; most of the mortgages had already been sold via MERS, into an investment pool where the actual investors were sold a security that was over-inflated in value and quality.

30.   Most institutions holding subprime mortgages required mortgage insurance on the loans, sometimes insuring against failure 30-times over. They stood to gain more if a borrower defaulted than if he performed fully; hence, there was not much of an incentive to modify or refinance loans for borrowers who had fallen on tough times – despite federal government programs paying lending institutions to do that very thing.

31.   For those loans that were insured against default – what happened to the insurance money? Has the foreclosing lender been paid once by the insurance company (financed by a federal bailout of insurance giant AIG and others) and seeks to be paid twice by foreclosing on the real property

and selling it? If the foreclosing lender has already been paid off, then is the proper party in interest the insurer?

32.   The MERS cartel also controls mortgage servicing and another product, called "foreclosure assistance." Their monopoly here is roughly 90 percent. One such firm has made national news by offering a menu of services, which has been reported by the national media to include "creating – that is, conjuring from thin air – various documents that the trust owning the loan should already have on hand." The firm offers creation of a "collateral file," i.e., all the documents needed to establish ownership of a real estate loan. "Equipped with a collateral file, you may be able to persuade a court that you were entitled to foreclose on a house, even if you had never owned the loan."[6]

33.   Attorney Generals from all 50 states are investigating the poor record keeping by MERS, banks, and the servicers (companies that collect mortgage payments). The Federal Reserve is investigating whether mortgage companies have cut corners in the foreclosure process, using "robo-signers" to sign thousands of mortgage

---

[6] Smith, Yves, "How the Banks Put the Economy Underwater," New York Times, October 30, 2010. http://www.nytimes.com/2010/10/31/opinion/31smith.html?_r=1

assignments and foreclosure documents without having made the legal investigation required to execute such documents.

34.   Many anti-trust claims involve esoteric mathematical analysis of claimed price manipulation by companies controlling as little as 10 percent of an industry in relatively small area. Complex math is not necessary in this case. Under any test, MERS and its shareholders control the mortgage industry, the foreclosure assistance industry, and the digital identification of real property.

35.   What MERS and the mortgage industry did was to turn poker in the back of the neighborhood bar, where there were no sharks and everyone knew each other and the pace was leisurely, into Monte Carlo, Las Vegas and internet gambling all rolled into one. As a result the real property markets were destabilized; banks made fabulous income on fees and a million families will lose their homes to foreclosure.  Some have alleged MERS created a Ponzi scheme.

36.   What justice demands today is that the borrowers -- and the investors -- in the mortgages have an opportunity to work through this mess of the securitization

&sq=mortgage securitization&st=cse&scp=1&pagewanted=all. Accessed 11/8/2010.

of mortgages and come to a resolution that is best for both parties, and additionally, the public at large.  Plaintiff requests the opportunity to work with the actual investors of the mortgages, which would be a question of fact that can only be resolved by an evidentiary hearing into who is the actual Note Holder, how much is owed, to whom, and, whether any third-party payments have been made on Plaintiff's behalf, by insurance, the government, or otherwise.

## STATEMENT OF FACTS

37.  Plaintiff incorporates each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

38.  Plaintiff entered into a loan transaction to finance the subject property at 163 W. Ikea Kai Place, Kihei, Hawaii, TMK No. (2) 2-1-024-053(Property).

39.  Plaintiff executed an Adjustable Rate Note in the principal amount of $1,452,500 on May 23, 2006 (Note).  At the time of the closing the Note was secured by a Mortgage affecting the Property.

40.  Plaintiff placed his trust and confidence in Defendants and each of them, to properly qualify them for the loans and to provide them with the most favorable loan

program and loan terms and felt Defendants would look out
for his best interest in meeting his mortgage needs.

41.   Plaintiff followed all instructions of Defendants
and submitted all documentation requested by said
Defendant. Plaintiff's felt that Defendants had a fiduciary
obligation to them to protect his interests and maintain
his privacy.

42.   Defendants required an appraisal of Plaintiff's
property as part of the loan application process which
Plaintiff paid for in the closing costs.  Plaintiff relied
upon the accuracy of the Defendants' appraisal in making
his decision to pledge his Property as collateral.

43.   Based upon Defendants' failure to provide any
other necessary documents and make required disclosures so
that Plaintiff could make a fully informed decision,
Plaintiff was lured into accepting and executing a Mortgage
and Note resulting in financial benefit to Defendants and
each of them, and to the detriment of Plaintiff,
substantially increasing the likelihood that Plaintiff
would default on the Mortgage and Note.

44.   Based upon information and belief, Plaintiff
submitted to Defendants a loan application, and Plaintiff
was not provided with a signed and dated copy of the
application as required under law.

45.   Based on information and belief, Plaintiff was not provided with time to review the loan documents prior to the loan's closing and/or signing of the mortgage documents.

46.   Based on information and belief, Plaintiff was not afforded the opportunity to have his legal counsel review the detailed documents.

47.   Based on information and belief, Defendants failed to provide Plaintiff with an initial truth in lending statement and a Good Faith Estimate within three days of the application as required by law.

48.   Based on information and belief, Defendants failed to provide timely notice of various other legally required disclosures concerning said loan application and loan, including, but not limited to, the final truth in lending disclosures, the HUD settlement statement, and notification of other consumer rights of Plaintiff.

49.   Due to the lack of above-referenced disclosures, among others, Plaintiff did not understand the true terms of the loan being proposed, and was unable to compare the loan with loan terms from other lenders, because Defendants did not explain, and/or concealed the true loan terms from Plaintiff.

50.  Based on information and belief, Defendants targeted inappropriate or excessively expensive loans to persons who were not financially sophisticated and were otherwise vulnerable to abusive practices.

51.  Based on information and belief, Defendants apparently used a no-income, no-asset income product for approval that was based on the alleged value of the collateral without considering the Plaintiff ability to sustain the future payments of the loan.

52.  Under the Truth in Lending Act (TILA), 15 U.S.C. §§ 1661-1666j, Defendants failed to provide Plaintiff with a notice of the right to cancel, an accurate payment schedule, disclose the interest rate, provide a signed and dated loan application, provide a Good Faith Estimate (GFE), a consumer handbook on mortgages, disclose that Plaintiff could obtain insurance with a vendor of his choice and not have to pay higher priced premiums to a provider of lender's choice, and otherwise accurately disclose the purported legal obligation of the parties.

53.  Under the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. sections 2601-2617, based on information and belief, Defendants failed to disclose all affiliated business arrangements, that they were giving the broker hidden fees for the referral of settlement business, the

HUD-1 settlement statement at closing, and that they could not charge fees in excess of the reasonable value of goods and services provided.

54.   Based on information and belief, Defendants failed to properly qualify Plaintiff as being able to afford the loan payments amortized over the life of the loan.

55.   Based on information and belief, Defendant failed to inform Plaintiff and explain in any meaningful way that Plaintiff could compare terms and/or might qualify for a better loan program offered by Defendants or its competitors.

56.   Based on information and belief, Defendants failed to disclose and/or deliberately concealed Plaintiff's consumer rights, including but not limited to; the right of rescission and/or cancellation of the loan transaction prior to closing and recordation of the Mortgage.

57.   Defendants failed to inform Plaintiff that by failing to follow generally accepted underwriting guidelines in qualifying Plaintiff for the loan that it was likely that Plaintiff would default and lose his home.

58.   Based upon information and belief, Defendants, and all of them, failed to inform and explain to Plaintiff

that they intended to securitize and sell the Note and/or
Mortgage and/or portions thereof to other lenders, loan
servicers, and/or investors.

59.   Defendants, and each of them, failed to inform
and explain to Plaintiff that they would disclose
confidential personal and financial information to other
banks or lending institutions or investors who sought to
purchase bundled loans that had been securitized and sold
as investments and otherwise failed to provide Plaintiff
with a required opt-out notice.

60.   Based on information and belief, Defendants, and
each of them, bought or sold highly leveraged instruments
in the futures, or options market, these trades were in
direct conflict of Plaintiff's interests.

61.   Based on information and belief, Defendants, and
each of them, actually gambled on the failure of Plaintiff,
the loss of his home, and, the depression of the housing
market.

62.   Based on information and belief, Defendants, and
each of them, did profit from the highly leveraged
instruments which were/are in conflict of Plaintiff's
interests, and the housing market in whole.

63.   Based on information and belief, the Defendants,
and each of them, as a whole, have operated as a common

enterprise while engaging in the acts and/or omissions causing harm to the Plaintiff and were known, and/or should have been known, to all Defendants and/or their successors, or predecessors in interest, and are imputed to all Defendants jointly and severally.

64.   Plaintiff made payments on said loan from his monthly income and from savings and from cash advances on credit cards, and experienced significant financial hardship due to having to pay for a loan that they were not properly qualified for under usual and generally accepted underwriting guidelines.

65.   Based on information and belief, Defendants, and each of them, intentionally and/or recklessly failed to disclose and/or concealed various information and documents from Plaintiff and knowingly placed Plaintiff in a loan he could not afford.

66.   Plaintiff experienced loan distress and asked Defendants for assistance in modifying and/or refinancing said loan.

67.   Based on information and belief, Plaintiff was denied a loan modification although Defendants received government incentives to promote, and procure such a mortgage modification.

68.   Based on information and belief, during the life of the loan, Defendants and/or their predecessors in interest sold and/or transferred the Note and Mortgage without proper endorsement or assignments, resulting in Defendants not having the right and interest to foreclose upon the subject property.

69.   Based on information and belief, Defendants failed to provide Plaintiff with legally sufficient and timely notice of the intent to foreclose thereby voiding the foreclosure and attempted sale of said property at auction.

70.   Violations of federal and state statutes, alleged herein, bar Defendants from filing, causing to be filed, and/or conducting ejectment proceedings against Plaintiff. Alternatively, Plaintiff's defenses, claims and rights, including but not limited to the right to recovery of damages, injunction and any other remedy available under State, Federal, and/or common law, under the Mortgage and Note bar Defendants from taking any action, including filing, causing to be filed, and/or conducting ejectment proceedings against Plaintiff.

## CLAIM I
## VIOLATIONS OF THE CLAYTON ANTI-TRUST ACT

71.   Plaintiff incorporates each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

72.   The conduct of Defendants as described more fully hereinabove violates the Clayton Anti-Trust Act, 15 U.S.C. § 12 et seq.

73.   Defendants have engaged in predatory conduct or anticompetitive conduct in an attempt to monopolize the mortgage lending and servicing market. Defendants intended at all times relevant herein to control mortgage lending prices and practices and/or to destroy competition with respect to this segment of commerce.

74.   Defendants inflated the real estate market in an effort to create and sell subprime mortgages. They sold over-leveraged, highly inflated loans to the Plaintiff, who was unsophisticated borrowers. Defendants sold these fraudulent securities to investors and participated in a ratings scheme to fraudulently rate these securities as safer than they truly were.

75.   Defendants and/or entities under their enterprise, took positions in the futures, or options, markets whereby Defendants sought to profit, and did profit, from the collapse of the real estate market, and,

benefited from the foreclosure of numerous mortgages that Defendants originated, serviced, or controlled.

76.   The Defendants' acts worked to create the collapse of the mortgage market, which in turn created an economic collapse unprecedented since the Great Depression. Plaintiff, like millions of Americans, experienced job layoffs and a severe decline in his income, which resulted in Plaintiff being unable to pay his mortgage payments and suffering a decline in his credit rating causing him to be unable to secure refinancing, which is just as Defendants planned.

77.   As a direct and proximate result of the unlawful conduct of Defendants, and each of them, in monopolizing and/or attempting to monopolize the mortgage lending and servicing market, Plaintiff has suffered pecuniary damages in an amount to be determined, along with other pecuniary and non-pecuniary damages.

## CLAIM II
## VIOLATIONS OF THE HAWAII ANTI-TRUST/ANTI-MONOPOLY ACTS

78.   Plaintiff incorporates each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

79.   Mortgage lending and servicing in Hawaii is an activity in or affecting interstate commerce, as the

parties traffic in personal service to foreigners and rely on foreign goods for their businesses.

80.   The conduct of Defendants as described more fully hereinabove violates the Hawaii Anti-Trust Act, Hawaii Revised Statutes § 480-13, and the Hawaii Monopolization Act, Hawaii Revised Statutes § 480-9.

81.   As a direct and proximate result of the unlawful conduct of Defendants, and each of them, in monopolizing and/or attempting to monopolize the mortgage lending and servicing market, have suffered pecuniary damages in an amount to be determined, along with other pecuniary and non-pecuniary damages.

**CLAIM III**
**VIOLATIONS OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT**

82.   Plaintiff incorporates each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

83.   As mortgage lenders, defendants are subject to the provisions of the REAL ESTATE SETTLEMENT PROCEDURES ACT ("RESPA"), 12 USC section 2601 et seq.

84.   In violation of 12 USC section 2607 in connection with the mortgage loan to Plaintiff, Defendants and/or their predecessors in interest violated RESPA by accepting

charges for the rendering of real estate services that were in fact charges for other than services actually performed.

85. As part of the scheme alleged in this Complaint, MERS members give, and MERS accepts, kickbacks pursuant to an agreement that federally related mortgage loans shall be registered with MERS. Such kickbacks violate 12 U.S.C. § 2607(a) and are not a violation that can be waived.

86. When a MERS member originates a federally related mortgage loan and registers the note and/or mortgage with MERS, it passes on the $3.95 MERS registration fee to the borrower.[7] It passes on the fee by including it within the fees disclosed on the HUD-1 Settlement Statement. The MERS member then kicks back to MERS the registration fee received by way of the borrower's payment of the settlement costs.

87. The registration fee that is actually paid by the Plaintiff does not benefit them, but is instead wholly related to services that benefit the lender, servicer, MERS and/or its members.

88. As part of the scheme alleged in this Complaint, MERS members give, and MERS accepts, charges made or received for the rendering of real estate settlement

---

[7] Beginning in 2007 this fee was increased to $4.95; subsequently increased again in 2009 to $6.95.

services in connection with transactions involving federally related mortgage loans other than for services actually performed. Acceptance by MERS of such charges violates 12 U.S.C. § 2607(b), and is a violation that cannot be waived.

89.  As a result of the Defendant COUNTRYWIDE's violations of RESPA, they are liable to Plaintiff in an amount equal to three times the amount of charges paid by Plaintiff for "settlement services" pursuant to 12 USC section 2607(d)(2).

90.  In violation of RESPA, 12 U.S.C. § 2607, in connection with the mortgage loan to Plaintiff, Defendants violated Home Ownership Equity Protection Act (HOEPA), which is codified at 15 USC section 1639 et seq., because Defendants misrepresented charges to Plaintiff as real estate services, that in fact, were not services pertaining to real estate.

91.  As a result of the Defendant's violations of HOEPA they are liable to Plaintiff in an amount equal to three times the amount of charges paid by Plaintiff for "settlement services" pursuant to 12 U.S.C. § 2607(d)(2).

92.  Section 3500.6 of RESPA requires lenders to provide a special information booklet at the time of loan

application.  Based on information and belief, the Special information booklet was not provided to the borrowers by Defendants at the time of the loan application.

93.  As a result of the foregoing violations, defendants are liable to Plaintiff for actual damages, treble damages, and such other damages as the court may award, together with costs of the action and reasonable attorneys' fees.

## CLAIM IV
## VIOLATIONS OF HOME OWNERSHIP EQUITY PROTECTION ACT

94.  Plaintiff incorporates each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

95.  In 1994, Congress enacted the Home Ownership Equity Protection Act (HOEPA) that is codified at 15 U.S.C. §1639, et seq., with the intention of protecting homeowners from predatory lending practices targeted at vulnerable consumers. HOEPA requires lenders to make certain defined disclosures and prohibits certain terms from being included in home loans. In the event of noncompliance, HOEPA imposes civil liability for rescission and statutory and actual damages.

96.  Plaintiff is a "consumer" and the Defendants are "creditors" as defined by HOEPA. In the Mortgage loan

transaction at issue here, Plaintiff was required to pay excessive fees, expenses, and costs.

97.  Pursuant to HOEPA and specifically 15 U.S.C. section 1639(a)(I), Defendant COUNTRYWIDE was required to make certain disclosures to the Plaintiff which are to be made conspicuously and in writing no later than three (3) days prior to closing, including:

> "You are not required to complete this agreement merely because you received these disclosures or have signed a loan application. If you obtain this loan, the lender will have a mortgage on your home. You could lose your home and any money you put into it, if you do not meet your obligations under the loan."

98.  Defendant violated HOEPA with numerous acts and material omissions, including but not limited to: (a) failing to make the foregoing disclosure in a conspicuous fashion; and (b) engaging in a pattern and practice of extending credit to Plaintiff without regard to his ability to repay in violation of 15 U.S.C. Section 1639(h).

99.  By virtue of the Defendant's multiple violations of HOEPA, including the sale of a defective product, Plaintiff has a legal right to rescind the consumer credit transaction.

100. Based on information and belief, Defendant further violated HOEPA by failing to make additional disclosures, including but not limited to Plaintiff not

receiving the required disclosure of the right to rescind the transaction.

101. Based on information and belief, Defendant further violated HOEPA by failing to provide an accurate Truth in Lending (TIL) disclosure.

102. As a direct consequence of and in connection with Plaintiff loss of legal and lawful exercise of his right to rescission, wherein the true "lender" is required, within 20 days of this notice of rescission to: (a) Desist from making any claims for finance charges in the transaction; (b) Return all monies paid by Plaintiff's connection with the transaction to the Plaintiff; and (c) Satisfy all security interests, including mortgages, which were acquired in the transaction.

103. Upon the true "lenders" full performance of its obligations under HOEPA, Plaintiff shall tender all sums that the true "lender" is entitled.

104. Based on defendants HOEPA violations including but not limited to defective product issues, each of the Defendants is liable to the Plaintiff for the following, which Plaintiff demand as relief:

(a)   Rescission of the mortgage loan transactions;

(b)   Termination of the mortgage and security interest in the property the subject of the mortgage loan documents created in the transaction;

(c)   Return of any money or property paid by the Plaintiff including all payments and improvement costs made in connection with the transactions;

(d)   An amount of money equal to twice the finance charge in connection with the transactions; including

(e)   Relinquishment of the right to retain any proceeds;

(f)   Actual damages in an amount to be determined at trial; and

(g)   Attorney's fees.

## CLAIM V
## VIOLATIONS OF FEDERAL TRUTH-IN-LENDING ACT

105. Plaintiff incorporates each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

106. The Truth in Lending Act (TILA), 15 U.S.C. §1605 et seq. and Regulation Z, Section 226.4 requires Defendants to fully and completely disclose the loan terms, the finance charge, the annual percentage rate, the right to rescind, and other consumer rights. These charges and rights were not fully and timely disclosed constituting a violation of TILA.

107. TILA also requires initial disclosures to be issued within three business days of receipt of the loan application and of any changes to the terms of a loan program. Borrowers are typically entitled to a TILA

disclosure concurrently with the RESPA Good Faith Estimate. The purpose of the early TILA disclosure and the RESPA Good Faith Estimate is to give the borrowers an opportunity to review the proposed terms and compare loan terms being offered by other lenders. The documents provided to the borrowers by the lender did not include an initial truth in lending statement or a good-faith estimate constituting a violation of TILA.

108. Defendants' failure to provide the required disclosures provides Plaintiff with the right to rescind the transaction, and Plaintiff, through this public complaint which is intended to be construed, for purposes of this claim, as a formal notice of rescission as may be applicable in common law and equity, hereby elect to rescind the transaction.

109. Pursuant to TILA, Defendants are liable to Plaintiff in amounts equal to the sum of actual damages and such additional damages as the court may allow, and the costs of action together with reasonable attorney's fees.

## CLAIM VI
## FRAUDULENT MISREPRESENTATION

110. Plaintiff incorporates each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

111. Defendants, and each of them, knowingly and intentionally concealed material information from Plaintiff that was required by Federal statutes and regulations to be disclosed to the Plaintiff both before and at the time of closing.

112. Defendants, and each of them, also materially misrepresented and/or failed to disclose material information to the Plaintiff with full knowledge by defendants that their affirmative representations were false, fraudulent, and misrepresented the truth at the time said representations were made and/or were omissions of material fact.

113. The omissions of material fact and/or the material misrepresentation of material facts include but are not limited to, the following:

    (a)  Concealing the failure to follow usual and customary underwriting guidelines to qualify Plaintiff for a loan;

    (b)  Misrepresenting and/or concealing the true terms of the loan;

    (c)  Misrepresenting the ability to refinance the loan at a later date;

    (d)  Misrepresenting and/or concealing the true amount of interest Plaintiff would have to pay over the life of the loan;

    (e)  Concealing that property values were declining and would likely continue to do so in the foreseeable future;

(f)  Concealing that Plaintiff would likely experience mortgage payment distress and had a high likelihood of defaulting on the Note;

(g)  Concealing that there would not be sufficient equity in the Property to refinance the loan;

(h)  Concealing any risks or warnings associated with the securitization of the Plaintiff's collateral (the Property);

(i)  Concealing that Defendants would wrongfully, improperly, and illegally report negative information as to the plaintiff to one of more credit reporting agencies, resulting in plaintiff having negative information on his credit reports and the lowering of his FICO scores such that they would not be able to qualify in the future to refinance the subject loan.

114. Under the circumstances, the material omissions and the material misrepresentations of the defendants were malicious.

115. Plaintiff, not being investment bankers, securities dealers, or mortgage lenders, reasonably relied upon the representations of Defendants in agreeing to execute the mortgage loan documents.

116. Had Plaintiff known of the falsity of Defendants' representations and/or have known of the omissions of material fact, Plaintiff would not have entered into the transaction which is the subject of this action.

117. As a direct and proximate result of the foregoing acts and/or omissions of Defendants, and each of them,

Plaintiff is entitled to rescission of the subject Note and Mortgage, and damages in such amounts as shall be proven at the time of trial.

## CLAIM VII
## BREACH OF FIDUCIARY DUTY

118. Plaintiff incorporates each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

119. Defendants, and each of them, by their actions in contracting to provide mortgage loan services and a loan program to Plaintiff which was not only to be best suited to the Plaintiff given his income and expenses but by which Plaintiff would also be able to satisfy his obligations without risk of losing his home, were "fiduciaries" in which Plaintiff reposed trust and confidence, especially given that Plaintiff was not and are not investment bankers, securities dealers, mortgage lenders, mortgage brokers, or mortgage lenders.

120. Defendants, and each of them, breached their fiduciary duties to the Plaintiff by fraudulently inducing Plaintiff to enter into a mortgage transaction that was contrary to the Plaintiff's stated intentions; contrary to the Plaintiff's interests; and contrary to the Plaintiff's preservation of his home.

121. Defendants, or entities with in the enterprise of Defendants, breached their fiduciary duties to the Plaintiff by taking positions in the highly leveraged futures or options market, such interests were in direct opposite of Plaintiff's interests and the general housing market as a whole.

122. As a direct and proximate result of the Defendants and/or their predecessors in interest breaches of their fiduciary duties, Plaintiff is entitled to rescission and damages.

123. Under the totality of the circumstances, the Defendants' actions were willful, wanton, intentional, and with the callous and reckless disregard for the rights of the Plaintiff, justifying an award of actual and compensatory damages, exemplary damages, and punitive damages to deter future similar conduct of the named Defendants. Further, and award of punitive damages will deter other persons or entities with similar inclinations.

### CLAIM VIII
### UNJUST ENRICHMENT

124. Plaintiff incorporates each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

125. Defendants, and each of them, have an implied contract and warranty with Plaintiff to ensure that the Plaintiff understood all fees, rates, payments and charges which would be paid to the Defendants, to obtain credit on Plaintiff's behalf, to not charge any fees which are not related to the settlement of the loan and without full disclosure to Plaintiff and that the loan products together would provide a 30-year mortgage designed specifically with the Plaintiff's known personal financial information required by the Defendants.

126. Defendants, and each of them, cannot, in good conscience and equity, retain the benefits from their actions of charging a higher interest rate, fees, rebates, kickbacks, profits and gains from any resale of mortgages and notes using Plaintiff identities, credit scores, income, appraisal and reputation without consent, right, justification or excuse as part of an illegal enterprise scheme.

127. Defendants, and each of them, have been unjustly enriched at the expense of the Plaintiff, and maintenance of the enrichment would be contrary to the rules and principles of equity.

128. Defendants, and each of them, have also been additionally enriched through the receipt of payment from

third parties including, but not limited to, investors, insurers, other borrowers, the United States Department of the Treasury, United States Federal Reserve, and others.

129. Plaintiff thus demands restitution from the Defendants and/or their predecessors or successors in interest in the form of actual damages, exemplary damages, and attorney's fees.

## CLAIM IX
## CIVIL CONSPIRACY

130. Plaintiff incorporates each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

131. In connection with the application for and consummation of the mortgage loan which is the subject of this action, Defendants, and each of them, agreed between and among themselves, to engage in actions and a course of conduct designed to further an illegal scheme, or accomplish a legal act by unlawful means, and to commit one or more overt acts in furtherance of the conspiracy to defraud the Plaintiff.

132. Defendants, and each of them, agreed between and among themselves to engage in the conspiracy to defraud for the common purpose of accruing economic gains for

themselves at the expense of, and detriment to, the Plaintiff.

133. The Defendants' acts, or omissions, were committed intentionally, willfully, wantonly, and with reckless disregard for the rights of the Plaintiff.

134. As a direct and proximate result of the actions of the Defendants in whole, have resulted in fraud and breaches of fiduciary duties, such that Plaintiff has suffered damages both monetary and physically.

135. Plaintiff thus demands an award of actual, compensatory, and punitive damages.

## CLAIM X
## COMPLAINT TO QUIET TITLE

136. Plaintiff incorporates each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

137. By means of this Complaint, Plaintiff has given notice to the named, known Defendants.

138. Additional real parties in interest may be the investors of the mortgage-backed security, the insurer through a claim of equitable interest, or some other person or entity yet unknown to Plaintiff at this time.

139. The mortgage backed security is a "securitized" bond-like note deriving its value from the underlying

mortgages, of which the Plaintiff's Mortgage is just one. Thus, Plaintiff is entitled to quiet title against Defendants and/or their successors and assigns, which will be identified herein when their identities become known.

140. Plaintiff is informed and believes and thereupon alleges that at all times herein mentioned each of the Defendants sued herein was the agent and employee of each of the remaining defendants and was at all times acting within the purpose and scope of such agency and employment.

141. Plaintiff is informed and believes and thereupon alleges that each of the Defendants claim or may claim an interest in the property adverse to Plaintiffs herein. However, the claim of said defendants are without any right whatsoever, and said defendants have no legal or equitable rights, claim, or interest in said property.

142. Plaintiff, therefore, seeks a declaration that the title to the subject property is vested Plaintiff alone and that the defendants herein, and each of them, be declared to have no estate, right, title or interest in the subject property and that the defendants and each of them, be forever enjoined from asserting any estate, right, title or interest in the subject property adverse to Plaintiff herein.

143. Wherefore, in this CLAIM, Plaintiff prays this Court will enter judgment against Defendant and each of them, as follows:

> (a) For an order compelling said Defendant(s), and each of them, to transfer or release legal title and alleged encumbrances thereon and possession of the subject property to Plaintiffs herein;

> (b) For a declaration and determination that Plaintiffs are the rightful holders of title to the property and the Defendant(s) herein, and each of them, be declared to have no estate, right, title or interest in said property;

> (c) For a judgment forever enjoining said defendants, and each of them, from claiming any estate, right, title or interest in the subject property;

> (d) For costs of suit herein;

> (e) For such other and further relief as the court may deem proper.

### CLAIM XI
### VIOLATION OF HAWAII BUREAU OF CONVEYANCE REGULATIONS AS A MORTGAGE SERVICER

144. Plaintiff incorporates each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

145. As of July 2010, Defendants, and each of them, as mortgage servicers, are required to register and be licensed with the state of Hawaii pursuant to HRS § 454M[8].

---

[8] **[§454M-6]   Prohibited activities.**  It shall be unlawful for any mortgage servicer in the course of any mortgage loan transaction:

No such licensing as required by law can be found.  As

stated throughout the Complaint herein, Defendants have

engaged in numerous unlawful activities in violation of HRS

§ 454M as well as other Hawaii Revised Statute. The

Defendants are subject to the penalties[9] for these and

other violation to be proven at trial.

---

(1)  To misrepresent or conceal material facts, to
make false promises, or to pursue a course of
misrepresentation through its agents or otherwise;

(2)  To engage in any transaction, practice, or course
of business that is not in good faith, does not constitute
fair dealing, or that constitutes a fraud upon any person,
in connection with the servicing, purchase, or sale of any
mortgage loan;

(3)  To fail to comply with the mortgage loan servicing
transfer, escrow account administration, or borrower
inquiry response requirements imposed by Sections 6 and 10
of the Real Estate Settlement Procedures Act, 12 United
States Code Sections 2605 and 2609, and regulations adopted
thereunder by the Secretary of Housing and Urban
Development; or

(4)  To fail to comply with applicable federal laws
and regulations related to mortgage servicing. [L 2009, c
106, pt of §1]

**[§454M-9]  Private right of action.**  Nothing in this
chapter shall be construed to preclude any individual or
entity that suffers loss as a result of a violation of this
chapter from maintaining a civil action to recover damages
and, as provided by statute, attorney's fees. [L 2009, c
106, pt of §1]

[9] **[§454M-10]  Penalty.**  Any person who violates any
provision of this chapter may be subject to an
administrative fine of not more than $5,000 for each
violation.

146. The State of Hawaii administrative rules "Department of Commerce and Consumer Affairs", Chapter 178, "administrative special mortgage recording fee guidelines" requires every transfer of an interest in real property, except fixtures, made as security for the performance of another act or subject to defeasance upon the payment of an obligation, to be properly recorded. The special mortgage recording fee (SMRF) is a special mortgage recording fee imposed on each mortgage and each amendment to a mortgage which increases the principal amount of the secured debt. The SMRF must be filed at the State of Hawaii Bureau of Conveyances and/or filed with the assistant registrar of the Land Court of the State of Hawaii.

147. Based on information and belief, the Mortgage and Note at issue has been traded (sold). Defendants should have filed a SMRF and an assignment of mortgage for each assignment of sale.

148. Defendants have sought to foreclose Plaintiff real Property and receive a distribution from the sale of Plaintiff property without possessing legally enforceable, recorded assignment of mortgages from the actual mortgagees. Under Hawaii law, before an entity would be entitled to receive a distribution from the sale of real property, their interest therein must have been recorded.

149. Defendants acts of pursuing a foreclosure action without the requisite legal title, while falsely stating that it had such title, and while lacking the right to engage in trust business in Hawaii, constitutes a "false, deceptive or misleading representation or means" in connection with the collection of a debt, in violation of the Federal Fair Debt Collection Procedures Act, 15 U.S.C. Sec. 1692e.

150. All of the Defendants are "debt collectors" as defined in 15 U.S.C. 1692e, because they regularly use instrumentalities of interstate commerce, and the mails, in attempting to collect, directly, or indirectly, debts owed or due or asserted to be owed or due to another, namely the actual lenders, mortgagors, and certificate-holders under the above-referenced pooling and servicing agreements.

151. Upon information and belief, Defendants failed to establish a complete and legitimate chain of assignment from the originator to the person assigning the Mortgage to Defendant.

152. Failure to file these assignments prohibits Defendants from exercising any judicial procedures against the Plaintiff.

153. As a direct and proximate result of the actions of Defendants, Plaintiff is entitled to possession of the

Property, entitled not to be evicted, and are entitled to damages in such amounts as shall be proven at the time of trial.

## CLAIM XII
## MISTAKE

154. Plaintiff incorporates each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

155. If the above mentioned wrongful acts and/or omissions of Defendants were not fraudulent misrepresentations and/or omissions of material fact, then the underlying transaction was entered into based upon mutual mistake which entitles Plaintiff to actual damages including all fees and costs paid to obtain the loan, together with other claims in such amounts as shall be proven at the time of trial.

## CLAIM XIII
## UNCONSCIONABILITY

156. Plaintiff incorporates each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

157. Plaintiff placed his trust and confidence in Defendants to make proper and timely disclosures, and properly qualify them for the loan, provide loan terms that

were in accord with economic conditions existing at the time, among other things.

158. Plaintiff did not understand the securitized loan transaction, or the true terms of the Notes and Mortgages, and were not fully and timely informed of the same by Defendants who held superior bargaining power over Plaintiff.

159. As a result of the above, the terms and conditions of the Notes and Mortgages are unconscionable, and Plaintiff is entitled to damages, repayment, reimbursement and/or indemnification of all monies that were paid and other claims in such amounts as shall be proven at the time of trial.

## CLAIM XVI
### UNFAIR AND DECEPTIVE ACTS OR PRACTICES

160. Plaintiff incorporates each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

161. The Plaintiff is a "consumer" as that term is defined in HRS § 480-1.

162. The Defendants, and each of them, describe acts and practices involved "trade or commerce" as that term is used in HRS § 480-2(a).

163. An unfair or deceptive act or practice (UDAP) in the conduct of any trade or commerce is unlawful pursuant to HRS § 480-2(a).  And certain deceptive trade practices are also unlawful pursuant to HRS §481A-3.  In connection with the subject loan, Defendants engaged in UDAPs that violate HRS § 480-2(a) and or 481A-3, including but not limited to:

       a.   Targeting financially unsophisticated and otherwise vulnerable consumers for inappropriate credit products;

       b.   Failing to adequately disclose the true costs and risks of the subject loan and its/their inappropriateness for Plaintiff;

       c.   Failing to disclose that lender approved the subject loan based on financial documents required by Defendants such as Plaintiff's tax returns and pay stubs without regard to Plaintiff ability to sustain the loan with any reasonable means test;

       d.   Falsely representing and/or failing to fully and completely disclose the amounts Plaintiff was required to pay;

       e.   Making a defective mortgage loan or loans that resulted in little net economic benefit to Plaintiff with the primary objective of generating fees;

       f.   Attempting to deprive Plaintiff of time in a fictitious modification process until the statute of limitations passed beyond a time for his legal right for rescission and/or cancel the subject loan.

164. Defendants, and each of them, violated TILA in connection with the subject loan constitute UDAPs in violation of HRS §§ 480-2(a) and/or 481A-3.

165. The conduct caused Plaintiff to suffer injury to his property, including without limitation wrongfully induced payment of money.

166. Defendants' described acts and practices offend established public policy and/or were immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers, and were therefore unfair in violation of HRS § 480-2(a).

167. Defendants' described acts and practices involved material representations, omissions or practices that were likely to mislead consumers acting reasonably under the circumstances, and were therefore deceptive in violation of HRS §§ 480-2(a), 481A-3 and/or 454M.

168. Pursuant to HRS § 480-12, a contract or agreement in violation of HRS Chapter 480 is void and is not enforceable at law or in equity.

169. Pursuant to HRS § 480-13(b)(1), a consumer who is injured by a UDAP is entitled, for each UDAP, to be awarded a sum not less than $1,000 or threefold any damages he or she sustained, whichever sum is the greater, and reasonable attorney's fees together with the costs of suit.

170. As a result of the wrongful acts and/or omissions of Defendants, Plaintiff is entitled to various remedies including, but not limited to, rescission, consideration, reimbursement, equitable recoupment, indemnification, damages (statutory, actual and treble damages), attorneys' fees and costs, and injunctive relief.

### CLAIM XV
### FAILURE TO ACT IN GOOD FAITH

171. Plaintiff incorporates each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

172. Defendants, and each of them, owed Plaintiff a fiduciary duty to deal with them in good faith and in a fair manner.

173. Defendants, and each of them, failed to deal with Plaintiff in good faith and in a fair manner by making various misrepresentations of material fact and/or omissions of material fact, not making the mandatory federal law disclosures, not providing loan relief and/or modification of loan terms so Plaintiff could maintain his interest in the Property, including but not limited to, failing to disclose that Plaintiff was not financially qualified for the loan, and/or the likelihood of the value of the Property was less than the appraised value, and,

that Plaintiff was likely to default and lose his home to foreclosure.

174. Plaintiff suffering various injuries and damages in such amounts as shall be proven at the time of trial.

175. As a result of the wrongful acts and/or omissions of Defendants, and each of them, Plaintiff is entitled to various remedies including, but not limited to, rescission, reimbursement, equitable recoupment, indemnification, damages (statutory, actual, punitive, and treble damages), attorney's fees and costs, and injunctive relief.

### CLAIM XVI
### RECOUPMENT

176. Plaintiff incorporates each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

177. As a result of the various wrongful acts and/or omissions made by Defendants, and each of them, Plaintiff is entitled to equitable recoupment of all monies paid by them with regard to the subject loan transaction, including all broker's fees and commissions, closing costs, all other fees, costs and expenses, interest and principal payments, improvements that were made, and the loss of the value of his investment in the Property.

### CLAIM XVII

## NEGLIGENT AND/OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

178. Plaintiff incorporates each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

179. Defendants and/or their predecessors in interest owed Plaintiff a fiduciary duty to avoid negligently and/or intentionally inflicting severe mental and emotional distress upon Plaintiff.

180. Defendants, and each of them, breached their duties by causing Plaintiff to suffer severe mental and emotional distress, by misleading them, providing a loan product they were not properly qualified for, in causing them to lose her savings, by giving them false hope they would qualify for a refinance and/or loan modification, and/or that they would be given loan assistance on reasonable terms that would allow Plaintiff the right to keep his home, and whereby Plaintiff have been unable to sleep, eat, or carry on normal marital relations due to the stress caused by Defendants.

181. The wrongful acts and/or omissions of Defendants and/or their predecessors in interest were a substantial factor and/or proximate cause of Plaintiff's suffering

injuries and damages in such amounts as shall be proven at
the time of trial.

182. As a result of the wrongful acts and/or omissions
of Defendants, and each of them, Plaintiff is entitled to
various remedies including, but not limited to, rescission,
reimbursement, equitable recoupment, indemnification,
damages (statutory, actual, punitive and/or treble
damages), attorneys' fees and costs, and injunctive relief.

### CLAIM XVIII

### VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT

183. Plaintiff incorporates each and every allegation
contained in the preceding paragraphs of this Complaint as
if fully set forth herein.

184. The Fair Debt Collections Practices Act (FDCPA),
15 U.S.C. §§ 1692-1692p as amended by Pub. L. 109-351,
Sections 801-02, 120 Stat. 1966 (2006), Section 809
requires among other things, that within five days after
the initial communication with the consumer in connection
with the collection of any debt, the debt collector shall
send the consumer written notice containing the amount of
the debt, the name of the creditor, and that the consumer
may dispute the debt within 30 days, and if the consumer
notifies the debt collector that the debt or any portion

thereof is disputed, it shall cease collection of the debt until it verifies the debt or the name and address of the original creditor and this is mailed to the consumer.

185. Based on understanding and belief, Defendants, and each of them, failed to give Plaintiff the required notice and opportunity to contest the debt and request verification of the same. Defendants' failure to give the required notice voids and invalidates any foreclosure action conducted with regard to the subject property.

186. Pursuant to section 813, Defendants and/or their predecessors in interest are liable to Plaintiff in amount equal to the sum of actual damages and such additional damages as the court may allow, and the costs of action together with reasonable attorney's fees.

### CLAIM IXX
### INTENTIONAL OR NEGLIGENT FAILURE TO WARN OF DEFECTIVE PRODUCT

187. Plaintiff incorporates each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

188. Defendants, and each of them, and/or their predecessors interest intentionally or negligently failed to warn Plaintiff of the risks associated with their loan products, which at all times relevant herein were known to

be defective and/or high-risk products, as evidenced by the voluminous warnings contained within the Trust Prospectus, which was provided to the would-be investors of the pools of mortgages, but which warnings were never provided to the Plaintiff.

189. The loan that the Plaintiff was enticed into purchasing was a defective product, exposing the Plaintiff, and others similarly situated, to a high risk of financial damage, including bankruptcy.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a Judgment against Defendants, as follows:

1.   For a judgment in favor of the Plaintiff.

2.   For a judgment awarding statutory damages in such amounts as shall be shown at the time of trial.

3.   For a judgment awarding actual damages in such amounts as shall be proven at the time of trial.

4.   For a judgment awarding treble damages.

5.   For a judgment awarding punitive damages in such amounts as shall be proven at the time of trial.

6.   For a Temporary Restraining Order or Order for Injunctive Relief.

7.     For a judgment of rescission, recoupment, reimbursement and/or indemnification in such amounts as shall be proven at the time of trial.

8.     For such other and further relief as the Court deems just and equitable in the premises.

### DEMAND FOR JURY TRIAL

Plaintiff, and each of them, hereby demand trial by jury on all issues triable by right to a jury.


Dated this 22 day of December, 2010, at Wailuku, Hawaii.


IVEY FOSBINDER FOSBINDER LLLC
A LIMITED LIABILITY LAW COMPANY


JAMES H. FOSBINDER
*Attorney for Plaintiff*